## No. 10,247.

THE STATE EX REL FRANCIS T. NICHOLLS, GOVERNOR, ET AL. VS. JOSEPH A. SHAKESPEARE, MAYOR OF NEW ORLEANS, ET AL.

In a suit by the Governor, intended to enforce the execution of a statute, the effect of which would be to coerce a municipal corporation, resisting the act, to make an annual appropriation of not less than $150,000 for a designated purpose, the same to be beyond the discretion and control of the corporation, the jurisdiction of an appeal is vested in the Supreme Court.

*Mandamus* is the proper remedy, and not *quo warranto* to compel the mayor and council of a municipal corporation to execute the duties imposed upon them by law, in the performance of which they are allowed no discretion.

Act 63 of 1888, which creates a police board for the City of New Orleans and defines its powers, is not unconstitutional, and its provisions must be carried out.

Laws are presumed to be constitutional until the contrary is judicially established, and they must be executed by the officers upon whom they impose the duty of doing so, who have no authority· to resist the execution thereof, on the ground that they contravene the Constitution.

In furthering the law, they enjoy immunity from responsibility.

When in 1882, the Legislature enacted the Charter of the City of New Orleans, it did so, in

State vs. City.

furtherance of authority delegated by the Constitution, and did not exhaust the powers thus conferred. It has preserved the right of amending or changing the Charter, in all respects, provided that, in doing so, it infringes no constitutional inhibition.

It has lawfully done so, in the exercise of such powers, when it enacted Act 63 of 1888, under consideration, which transgresses no constitutional limitation, and which, being constitutional, must be executed as intended by the Legislature.

APPEAL from the Civil District Court for the Parish of Orleans. Voorhies, J.

_Walter H. Rogers_, Attorney General, _E. E. Moise_ and _W. W. Vance_ for the Relators and Appellants:

1. A mandamus lies to commissioners, or other ministerial officers, to compel them to discharge the duties imposed by legislative enactments. 2 McCord (S. C.) 176 Ann.
2. There need be no positive refusal to perform the duty. It is sufficient if there be unreasonable delay, and manifest intention not to perform it. 32 N. J. Law, 39.
3. In proceeding by mandamus, want of interest should be specially pleaded in return. 3. N. J. H. 259.
4. In order that a party seeking to have declared unconstitutional a law, it is necessary to show not only wherein he will be injured, but in what respect he will be injured or prejudiced. Injury will not be presumed. 56 Penn. State 359.
5. Ministerial officers, created by legislative authority, will not be heard to plead the unconstitutionality of a law as a justification of refusal to discharge a plain statary duty. Northwestern Rep. 25, p. 587, 11 Ann. 587.
6. The public officers necessary for the police of the City of New Orleans, within the meaning of Article 253 of the Constitution, are the permanent officers, purely municipal, created by the charter, such as the mayor, treasurer, comptroller, commissioners of public works and police, and common council. 13 Ann. 304.
7. Article 253 of the Constitution, which provides, "pursuant to the mode of election which shall be provided by the General Assembly," is a complete recognition of the legislative power to enact Act 63 of 1888. Id.
8. It is the duty of the Governor and Attorney General to appear for, institute and prosecute all suits they may deem necessary for the prosecution of the interest and rights of the State. Article 71, Constitution. Act 65, 1884.

_Carleton Hunt_, City Attorney, for the Respondents and Appellees:

Where, in a petition for a _mandamus_ to compel the Mayor and the members of the Council of the City of New Orleans, to execute an act of the Legislature, by proceeding, among other things, to an election thereunder, and there is no actual default or omission of duty alleged by relators, there is no cause of action for a _mandamus_.

Where relators seek enforcement of an act of the Legislature, and among other things, the time and manner of the execution thereof is left, by the act, discretionary with respondents, there is no cause of action for a mandamus.

The relator, in proceeding for a mandamus, is the real plaintiff. On the trial on the merits, the relator must make out his case by offering, introducing and causing to be filed the evidence required to support his demand, and if he does not do this, his demand will be rejected.

Act 63 of the Acts of 1888, entitled "An Act to create a Police Board" for the City of New Orleans, and defining its powers, is repugnant to Article 253 of the Constitution of Louisiana which guarantees to the citizens of the City of New Orleans the right of appointing the several public officers necessary for the administration of the police of said City, and is therefore null and void.

### ON MOTION TO DISMISS.

The opinion of the Court was delivered by

POCHÉ, J.    Relators, whose object was to enforce the execution of Act No. 63 of 1888, entitled "An Act creating a Police Board for the City of New Orleans, and defining its powers," are appellants from a judgment which rejected their application for a writ of mandamus to the end proposed by them.

Appellee's motion to dismiss the appeal is grounded as follows.:

"That this Court is without jurisdiction *ratione materiæ* to entertain and pass upon relators' petition, there being no pay attached to the office of commissioner of police herein involved, and nothing to show that the amount in dispute exceeds $2000 00."

If the controversy involved no other issue but the creation of the right to the office of commissioner of police, there would be some merit in the motion. But such is not the case under a proper appreciation of the pleadings, and a due consideration of the statute sought to be enforced, which is made part of relators' petition in the case.

A careful analysis of the act discloses that its true and clear purport is to provide for a complete reorganization of the entire police force of the City of New Orleans, by withdrawing from the Mayor and City Council the power of appointing and controlling the force, and by conferring that power to the Police Board created by the statute.

And in terms, the act includes in the powers conferred to the Board, that, which might have been claimed by logical inference, of administering the fund to be appropriated by the city authorities to meet the payment of the salaries of all persons employed in, or connected with, the force.

After imposing on the Board the duty of making an annual estimate of the sums required for the expenses of maintaining the force during the ensuing year, Section 20 of the Act provides: "The Common Council shall set aside in the budget of expenses, a sum equal to that required according to the estimate made as aforesaid, by the Police Board; provided, that said Council shall have the right to reduce said estimate to a sum not less than one hundred and fifty thousand dollars ($150,000) for the police department, including the amount to be received" "from the wharf lessees, whenever the revenues of the city will not justify or permit a larger appropriation."

By reference to previously existing laws, under which the compensation and the control of the police force were left to the Mayor and City Council, it appears that the widest latitude and absolute option were left

to the city as to the appropriation and as to the disbursement of funds needed for the salaries of all persons employed on the force.

The only mandates of the law on the subject were to the effect of conferring the power to, and making it the duty of, the council, "to preserve the peace and good order of the City," * * * and "to organize and provide an efficient police," coupled with the general power and corresponding duty of providing pecuniary means necessary to that end.

That, under such grant of power, the City had the option to organize a small or a large police force, and by that means, as well as by the way of fixing the salaries of all persons on the force, to determine the amount to be appropriated therefor. But under the law which the Governor is now seeking to enforce, all matters connected with the costs of providing an efficient police are removed from the discretion or control of the City, and the latter is ordered, in mandatory terms, to provide annually a sum, not less than $150,000, for the purpose of maintaining the police force. It thence follows, that a judgment which would enforce the execution of the act in question would, in its pecuniary effect or result, be tantamount to a mandamus directed to the City Council, ordering an annual appropriation, for an indefinite number of years, of not less than $150,000, for a designated purpose, which cannot be varied or departed from under any circumstances.

It is too patent to admit of any doubt or discussion that, by such a judgment, the City, herein represented by the Mayor and Council, would be affected in her pecuniary interests in an amount exceeding $2000, and *that* is the matter in dispute in the controversy.

It therefore follows that, if cast in the suit, the defendant would have had the unquestioned right of appeal to this Court, and it is well settled in our jurisprudence, that such a feature in a cause is the proper test of jurisdiction in case of appeal by either party to the controversy.

Conceding, therefore, that the Governor has no direct or pecuniary interest in the contestation, it is quite apparent that the judgment to be rendered in the cause will affect the City of New Orleans in an amount exceeding the lower limit of our jurisdiction, and that his right of appeal to this tribunal must be recognized and enforced.

The motion to dismiss is therefore denied, at appellees' costs.

---

### DISSENTING OPINION.

WATKINS, J. It is my deliberate conviction that this court has no jurisdiction of this cause, *ratione materiæ*, and that the respondent's motion to dismiss the relators' appeal should prevail.

The Executive, joined by the Attorney General, appears as relator, and, under the provisions of Article 72 of the Constitution, which directs that "He shall take care that the laws be faithfully executed," requests a peremptory mandamus against the Mayor of the City of New Orleans, to compel him to execute and enforce Act 63 of 1888, it being an "Act creating a Police Board for the City of New Orleans, and defining its powers."

This enactment was approved and became a law on the 11th of July, 1888. It does not impose any duty, whatsoever, on the Executive, or Attorney General, nor confer upon either any power or emolument.

It provides "that the powers and duties connected with, and incident to the police department, and police discipline of the City of New Orleans * * shall be vested in and exercised by a board consisting of six commissioners and the Mayor of the city * * and such officers * * as may be appointed by said board. That said commissioners shall be elected by the common council of New Orleans * * The Mayor of the City of New Orleans shall be the presiding officer of said board, but shall have only a casting vote thereon." Secs. 1, 2, 3.

There is no compensation, salary or perquisite provided by this statute in favor of the Mayor or police commissioners. The only provision contained in the act, touching the collection, or disbursement of money, is in Section 20. It directs that the said Police Board shall * * make up a financial estimate of the sums required for the expenses, during the ensuing year, of the *police force*, less expenses and disbursements of the Police Board."

It further directs that the "common council shall set aside, in the budget of expenses, a sum equal to that required, according to the estimate aforesaid, by the Police Board; provided, that said council shall have the right to reduce said estimate to a sum of not less than $150,000 for the police department, etc."

Then, what is "the matter in dispute," which confers jurisdiction on the court? Art. 81 Const.

This proceeding is not taken against a police board, organized under this statute, to compel it to "make up a financial estimate;" or taken against the common council to compel it "to set aside, in the budget of expenses, a sum equal to that required by the Police Board."

If the mandamus had for its object, either of said purposes, there would be no occasion for *action* by the Governor to compel the execution of this statute, because the organization of the Board of Police Commissioners, would, of itself, be an execution of the law. Evidently, the question involved — the only one — is the abstract right of the Gover-

nor to compel, by mandamus, the chief executive officer of the City of New Orleans to enforce this police law. The relator has no appealable interest which can be affected by the decision of this suit in an amount in excess of $2000. No judgment could be rendered by this court which could involve a gain, or a loss of $2000 to either the relator or the respondent. This court has no jurisdiction to determine abstract questions of law, unaccompanied by any monied demand.

Whether a statute is legal, constitutional, or enforceable, can only be determined in a court of justice, when the litigants, seeking its enforcement, have a monied, or property interest at stake, and their right to which depends upon the enforcement thereof.

In my view, the opinion of this court, as expressed in State ex rel. Crean et al vs. P. L. Bouny, State Tax Collector et al, 32 Ann. 1188, is conclusive on the question of the jurisdiction of this court, *ratione materiæ*, in this case. It is so clear-cut, so concise, and judicially accurate that I will append an extract from it, as the most efficient mode of enforcing the view I entertain. It says :

"When we disposed of the motion to dismiss this appeal, we expressly reserved our right to sustain that motion, if on the trial of the merits an appealable interest should not be proven.

"In view of the public interest involved in the decision of the alleged unconstitutionality of an important legislative enactment, regulating matters of vast legal and pecuniary interest to the State, we had hoped that a hearing of the cause on the merits would develop that the matter in dispute between the parties to this suit did not exceed $1000.

"But after hearing the oral argument of counsel on both sides, and carefully considering their able briefs submitted on this point, we are reluctantly constrained to recognize that we are deprived of jurisdiction of the cause. With the exception of suits for divorce and separation from bed and board, and of cases involving the legality or constitutionality of any tax, toll or impost, or of any fine, forfeiture or penalty imposed by a municipal corporation, our civil appellate jurisdiction must be tested by the pecuniary amount involved in the controversy, as between the parties thereto. The magnitude of public interest awakened by the peculiar litigation, the importance of the legal question involved, added to the dire consequences to flow from the execution of an alleged unconstitutional act of the Legislature, cannot alone be invoked as the test of our jurisdiction in any given case, and cannot be strained so as to clothe the judicial department of the State with the power to interfere with, or arrest, the acts of the legislative department. To justify such an interference, which, in proper cases, is clearly sanctioned by the con-

stitution in all republican governments, the jurisdiction of the tribunal appealed to must appear unequivocally under some of the modes provided for in the organic law, in default of which court must decline their aid or interference.

"Under such a test it is impossible to demonstrate in this case that the appealable interest of any of these appellants individually, or all of them collectively, can be affected by the decision of the cause in any amount exceeding $1000.

"It must be conceded that the defendants, State officers, whose official acts alone can be affected, shaped or regulated by the decree, have no direct or personal pecuniary interest in contestation. And it appears to us equally clear that no judgment can be rendered under these pleadings which could involve a gain or a loss, exceeding $1000, to any or all of the plaintiffs in this case."

In State *ex rel* Newman vs. Hoyles, 32 Ann. 1130, this Court, in the discussion of the same question, employed the following language, viz:

"The appellate jurisdiction of this Court is limited, by the express terms of the Constitution, to cases where the matter in dispute exceeds $1000, exclusive of interest; to suits for divorce and separation from bed and board; to cases where the constitutionality or legality of any tax, toll, or impost, or fine, forfeiture, or penalty imposed by a municipal corporation, is in contestation, without regard to amount; and, to questions of law in certain criminal cases. This is the full extent of our appellate jurisdiction. Does the case at bar fall within the limits prescribed? The personal interest of the relator must be measured by the amount of salary involved in the contest, together with the damage claimed in the petition. These constitute the matter in dispute between the litigants.

"The salary, or *per diem*, of a police juror, for his entire term of office, is far below the prescribed amount; and the damage claimed, which is only $100, does not raise it to the sum required to invest this Court with jurisdiction.

It has been suggested, however, that the nature of the case, on account of its involving an important public interest, and the rights to an office in which the people of an entire parish are interested, is sufficient to give jurisdiction.

"We cannot recognize this doctrine. The matter in dispute—the in language of the Constitution—means, according to the plainest rule of construction, the pecuniary interest involved, and the question of jurisdiction must be tested and determined by the money value of what is claimed in the petition.

" The jurisdiction of this court is limited and defined, in precise terms, by the Constitution — the instrument that created it — and it is not to be enlarged or extended by implication; and we cannot go beyond these express limitations without usurpation."

The plain and unambiguous meaning of these decisions is easily discerned from the phrases, " the jurisdiction of this court is limited and defined, in precise terms, by the Constitution    *    *    and we cannot go beyond these express limitations, without usurpation ;" and, " the jurisdiction of the tribunal appealed to must appear unequivocally, under some of the modes provided for in the organic law, in default of which courts must decline their aid, or interference."

But I understand the theory of the opinion of the majority to be that the ultimate effect of a mandamus made peremptory, would be to transfer the control of the police department, from the City Council to the Board of Police Commissioners to be appointed under said police law; and that, as a consequence, the said board would have and enjoy the disbursement of the fund which is annually appropriated for the expenses of the police force, and the council would cease to exercise dominion over it. Hence the argument is deducted that, inasmuch as this fund can never be less than $150,000, this sum is involved in the controversy, and this court is thereby invested with jurisdiction, *ratione materiæ*.

Let me put this theory to a practical test.

There is no provision of said police law, other than those quoted *supra*, touching the appropriation, or expenditure of funds applicable to the police force. They are, substantially : 1. To confer upon the Board of Police Commissioners the power " to make up a financial estimate " of such expenses; and, second, to require the council to set aside, in its budget, "a sum *equal*" to that estimate, and not to restrict it to a sum less $150,000.

The city charter confers on the council the power " to organize and provide an efficient police." Sec. 6, Act 20 of 1882.

It makes it the duty of the council to organize each of the executive departments of the city government, to regulate the *number* of employees therein, and to *fix their salaries ;* but the chiefs of said departments were given the right to *appoint* such employees.

It provides that " the council shall fix the compensation of any officer of the city    *    *    whose services are, by law, to be paid by the city    *    *    and the number and compensation of all persons on the pay roll of the city." Sec. 40.

It confers upon the council the power to make up an estimate of the expenses of the executive departments and to make appropriation there-

for. It also provides that "no money shall be paid out of the treasury, unless authorized by an ordinance or resolution of the council, and upon a warrant signed by the comptroller." Sec. 21.

These features of the city charter have been altered by this police law, in but two essential particulars, viz:

1. So as to create a Board of Police Commissioners, who shall be appointed by the City Council.

2. So that this board shall select and appoint the police force, and estimate their expenses.

It does not confer upon this board the right to audit, or disburse the police expense fund; nor does it limit the dominion of the council over it, as provided and directed in the quoted provisions of the city charter.

It does not deprive the council of the power of making an estimate of police expenses, but simply declares that "the council shall set aside, in the "budget of expenses, a sum *equal* to the estimate of the police board." The council is not bound to accept the estimate of the police board. They may increase it, or diminish it "to a sum not less than $150,000 * * including the amount to be received from the wharf lessees." Sec. 20, Act 63 of 1888.

Thus, will it appear that, even the limit of the reduction which the council may make is not a fixed and invariable one. For if, in any year, a sufficient amount shall be received from the wharf lessees, to aggregate $150,000, any estimate of police expenses, made by the Board of Police Commissioners, could be totally ignored and rejected by the council in making up its budget.

Therefore, in my opinion, this police statute confers upon the Board of Police Commissioners no control over the police expense fund, and deprives the council of none.

If this court, having assumed jurisdiction, should make the mandamus peremptory, this decree would not have the effect of transferring the control of this fund from the council to the commissioners, and this argument in favor of jurisdiction fails.

But conceding this, *arguendo*, can such remote consequences constitute a jurisdictional element? I think not. The Board of Police Commissioners have not been appointed by the council, no estimate of police expenses has been made, and there is no police expense fund *in esse*.

How can any judgment this court may render affect the board not yet appointed; such officers and persons as this police board, and police force may displace; or a fund not yet created?

But I understand the contention of the Attorney General to be that it is the magnitude of the public interest involved which gives jurisdiction.

If this were true, as a general proposition — which I deny — it cannot be in this case, because the statute in controversy affects no part of the State except New Orleans, a municipal corporation. In *any* view that can be taken of this case, it must be borne in mind that the *relator* is appellant and it is *his* appeal that is sought to be dismissed; and that it is to be judged from the standpoint of *his* interest, as stated in his petition.

Such is the uniform and unvarying current of our jurisprudence, as I understand it.

Entertaining this view, I deem it my duty to dissent from the opinion of the majority.

## On the Merits.

McEnery, J. The nature of this suit and the facts of the case and the objects and purposes of Act 63 of 1888, have been fully stated in the opinion of the court on the motion to dismiss.

Respondents allege in their return to the alternative writ, that there is no cause of action disclosed in the petition for mandamus. This was disposed of in the motion to dismiss. In argument it is alleged that the relators offered no evidence in the trial below to show the necessity for the issuance of the writ, and the record contains no evidence to justify a peremptory mandamus. The alternative writ issued on the affidavit of relators. The respondents answered alleging their excuse. The case was tried on the traverse made to the alternative writ. The answer to the alternative writ shows conclusively that the Mayor and City Council of New Orleans have refused to obey and execute Act 69 of 1888. It was not necessary that the respondents should have been notified of the intention to apply for the writ, and a demand made upon them to carry into effect said writ. An absolute and unqualified refusal to execute said writ has been shown by the inaction and silence of the Mayor and council.

It is alleged that a writ of *quo warranto*, and not a mandamus, is the proper proceeding to be employed by relators. The distinction between the objects, purposes and functions of these writs is well defined. It is not necessary to state them. Relators are not attempting to recover any office or franchise from the city, or any forfeiture of, or any right to any corporate office or franchise, or the usurpation of any franchise on the part of the Mayor and Council, nor is there any inquiry as to any right, exercised by the Mayor and council in the discharge of their official duties.

Relators apply for a mandamus to compel the Mayor and council to do an act which pertains to their office. A mandamus is the appropriate remedy. 3 Bla. Com. 110.

It will lie to compel a corporation to perform any specific act within the scope of its duties. 25 Ann. Rep. 461.

It is also alleged that the writ cannot issue because it will interfere with the discretion vested in the Mayor and council by the act.

The general rule is that if the inferior tribunal or corporation has a discretion and acts and exercises it, this discretion cannot be controlled by mandamus. But if the inferior body refuses to act when the law requires it to act, and there is no other legal remedy, a mandamus will lie to compel action, and the court will settle the legal question, which shall govern, but without controling the discretion of the subordinate jurisdiction. Dillon Mun. Corp., par. 665.

In the instant case there is no question relating to the exercise of any discretion by the Mayor and council in the execution of the act.

We are asked to compel them to carry into effect an act of the General Assembly relating to the City of New Orleans. In all matters relating to their discretion, where it is vested in them by said act, they are left to themselves, and we are not asked by relators to grant any order directing in what manner the Mayor and council shall perform the duties imposed upon them by the law which they seek to have enforced.

Respondents, in their return, excuse themselves, because the Act No. 63 of 1888 is unconstitutional, null and void, and was enacted in violation of the Constitution of 1879, and particularly of Article 256 of said Constitution, and it was the duty of the Mayor and council to refuse to obey and carry into execution said act. In this they have erred.

A government whose laws can be ignored by those whose duty it is to execute them is feeble, weak and inert, and is wanting in that vigor, strength and energy that will insure its perpetuity. The Mayor and council of the City of New Orleans are the officers of a subordinate political corporation, not only charged with municipal duties, but as a constituent part of the State government they owe allegience and obedience to their sovereign, the State of Louisiana, whose majesty, dignity and power they must uphold and whose mandates they must obey. They cannot defy the law, constitute themselves the judges of its constitutionality, and pronounce upon its validity when they are charged with its execution, in advance of the judicial tribunal, whose sole prerogative it is to pass upon its constitutionality. It is their duty to obey the law until the law has been declared null and void by the judicial department of the government.

State vs. City.

The presumption is always in favor of the constitutionality of the law, to that extent that the case must be so clear that no reasonable doubt can exists as to its constitutionality. Courts are cautious in dealing with constitutional questions, and they will not pronounce on the constitutionality of a law on collatteral questions unless it is essential to the determination of the point in controversy.

There are instances where courts have refused to pass on a constitutional question unless by a full bench; and where they would not pronounce an act void if within the scope of legislative powers, although contrary to natural justice, or violative of some fundamental principle of Republican government, or because they conflict with some supposed spirit of the Constitution. Officers acting under an unconstitutional law have been held to be *de facto* officers, and officers executing an unconstitutional law have been protected. Therefore, when the judiciary, whose duties are to pass upon the constitutionality of an act is so careful and conservative in its deliberations before passing judgment as to its validity, it seems but reasonable to require, in a well constituted government, obedience to it by officers who are to execute it, until its constitutionality is passed upon by the judiciary. Bassett vs. Sheriff, 11 Ann. 672.

In considering the question as to the constitutionality of the Act No. 63 we will only inquire into the authority of the Legislature to enact it, as no particular clause is attacked. We fully concur with the City Attorney in the statement that the right of self government lies at the foundation of our institutions, commencing with the humblest political subdivision and reaching to the height of the State and National governments; and that the rights of these several local subdivisions are to be carefully guarded by every department of the government.

There can be no doubt but that the surest and earliest bulwarks against despotic power, the preservation of order, the protection of life and property, in fact, the very foundations of modern liberty, owe, in a great degree, their origin to the elective governments of cities which grew in power and influence after the fall of the Roman Empire. But they owed their origin and derived their existence from a superior power as in this country all public corporations derive their existence from legislative will. They are controlled as to what they may do, and in the manner in which they may do it, by their charter or acts of incorporation which are the laws of their being and which they cannot dispense with, alter or change. The scope of legislative authority over a municipal corporation is limited only by the terms of the State and Federal

Constitutions and the necessary implications derived therefrom. 24 Mich. 44.

As a principle of constitutional law it is now well settled that the police powers of the State for the protection of the public health, public safety and public morals are inalienable.

Act 63 of 1888 comes under the police powers of the State, and the Police Board therein created is empowered to regulate, as provided for in said Act, the public safety, public health and public morals. All these matters of police are embraced in the Act.

Art 253 of the Constitution of 1879, which it is alleged is violated by Act 63, is as follows :

"The citizens of the City of New Orleans, or any political corporation which may be created within its limits, shall have the right of appointing the several public officers necessary for the administration of the police of said city pursuant to the mode of election which shall be provided by the General Assembly."

The definition of appointment is " the designation of a person by the person or persons having authority therefor to discharge the duties of some office or trust;" and election means, as employed in said article, " choice " or ' selection," as defined in Rouvier's Law Dictionary.

Section 1 of Act 63 provides that the Police Board shall be elected by the City Council. Their term of office is for twelve years. The Police Board is thus created by the Act. There can be no doubt but that it was within the authority of the Legislature to create the Police Board. The objection is to the mode of selection. The City Council undoubtedly has a legal existence. There can be no doubt of the right of the Legislature to confer upon said council the authority to elect. The council, by virtue of the city charter granted in pursuance of Acts 253, 254 of the Constitution, elects and appoints certain officers· The Legislature, when it granted that charter, did not exhaust its authority. It can still cancel or alter or change it, or give the several departments of the city government additional powers. It can authorize the City Council to choose other officers than those whom it was authorized to elect in the first instance. Therefore the City Council, by legislative grant, has the authority to designate the person or persons to discharge the duties of some office or trust. And as the Constitution authorized the Legislature to provide the mode of " election" or " choice," it had the right to exercise that authority, as it has done in Act 63. The mode of election is discretionary with the General Assembly, and the manner in which it has exercised this discretion cannot be questioned.

The corporation of the City of New Orleans was created by the State

for political purposes, having subordinate and local powers of legislation. Those matters which are of concern to the State at large, although exercised within defined limits, such as the administration of justice, the preservation of the public health, and the regulation of public morals, are still under legislative control, while the enforcement of municipal by-laws are matters for purely local legislation and control. In its public capacity, as a part of the State machinery, the corporation of the City of New Orleans owes a responsibility to the State government in the performance of acts for the public benefit, and in the regulation of this responsibility—the manner in which these acts shall be done, and by whom, the authority of the State is supreme. Dillon Mun. Corp. § 66.

Under Act 63 no right or franchise, no act of self government, has been taken away from the City of New Orleans. All the officers chosen by virtue of said Act are citizens of the city, and the objects of the Act are entirely within the administration of its corporate authority.

The Act No. 20 of 1880, the present charter of the City of New Orleans, from which the Mayor and Council derive their powers of government, is as amenable to their complaint of unconstitutionality as Act No. 63. In that Act the City Council is authorized to appoint and elect, and the several officers are authorized to appoint officers necessary to the administration of the police powers of the City of New Orleans. It will not, we presume, be denied that the police powers of the city government comprehend everything necessary to be considered for its internal management and administration. The City Council, by said Act, is empowered to appoint a City Attorney, and to elect a City Surveyor; and whenever a vacancy occurs in the office of Comptroller, Treasurer, Commissioner of Public Works, Commissioner of Police and Public Buildings, it is made the duty of the Council to elect a citizen to the position thus made vacant. The Commissioner of Police and Public Buildings is authorized to appoint a Superintendent of Fire Alarm, and Police Telegraph and telegraph operators. This is the charter granted to the city in pursuance of Acts 253 and 254 of the Constitution of 1879. The Legislature directed the mode and the manner of electing the officers of said city, by ballot at a general election, and by authorizing the City Council to appoint and elect, and by directing the Commissioner of Police to appoint.

In creating the Police Board for said city, the Legislature has only taken away certain duties which had been conferred upon the Council, and placed them in the Board. The Council has the right to elect the members of this Board, and the officers of police appointed by the

Board and this is no greater stretch of power than was exercised in the Act No. 20 of 1882, creating the present city government.

The twelve year term, fixed by the Act No. 63 of 1888, for the incumbency of the office, is not in conflict with any provision of the Constitution. The Constitution provides that the election for city officers shall take place every four years, and at the same time of the general State election. This applies to all officers who are to be voted for at a general election. The members of the Board of Police are not such officers. Its members are elected by the City Council to perform certain functions designated by the Legislature.

The Board is not a co-ordinate department of the city government, and its duties are purely ministerial. It is an adjunct of the already established departments of the city government, and in some respects is subordinate to and controlled by them.

The Police Board has to report to the Common Council the condition of the police force of the city, and the council makes an appropriation on the estimates furnished by the Police Board for the police force and has the right to reduce said estimate. The City Attorney is the adviser of the board, and the Treasurer of the City of New Orleans is, with the treasurer of said board, the trustee of the fund arising from fines imposed upon members of the police force. The Mayor of the city is ex-officio president of the board, and can, at any time, remove the commissioners electected by the council, for high crimes, misdemeanors, malfeasance, etc.

Had the provisions of Act 63 of 1888 been incorporated into Act No. 20 of 1882, we are of the opinion that no complaint of the unconstitutionality of the act could have been urged.

And, after all, the question is narrowed to whether or not the Legislature has, by the Constitution, after granting certain powers of government to the city, been deprived of all power to interfere in the affairs of said city.

Act 254 of the Constitution of 1870, says:

" The General Assembly, at its next session, after the adoption of this Constitution, shall enact such legislation as may be proper to liquidate the indebtedness of the City of New Orleans, and apply its assets to the liquidation thereof. It shall have authority to cancel the charter of said city and remit its inhabitants to another form of government."

The sweeping power thus conferred upon the General Assembly to alter, change, or cancel the city charter and remit the inhabitants of New Orleans to another form of government is only curtailed by the preceding article, 253, which provides that no matter what change may be,

State vs. City.

or to what form of government the citizens of New Orleans may have imposed upon them, the citizens of New Orleans, either by ballot at a general election, or by selection or appointment by some legally constituted authority in the civil corporation, shall have the exclusive power to choose their own officers. The object of the constitutional proviso was to confer upon the citizens of New Orleans absolute control of their government in the exclusive choice of officers necessary for its administration, subject only to the mode of election provided by the General Assembly, free from interference, control or appintment by the Executive department of the State government, thus preventing a repetition of the sad experience through which the city passed during the era of reconstruction and under the Constitution of 1868.

This article is still in force. Its authority did not cease after the enactment of the law No. 20 of that session which created the present city government. There is nothing in the article which limits its operation to that session only.

The General Assembly did not, even in Act 63, change or alter the form of government of the City of New Orleans.

The Board is composed of members elected by her common council, a body already in existence and having authority under the charter to elect certain municipal officers, and the Act only enlarges this authority by authorizing it to elect the Commissioner of the Police Board. The Board is under the control of the corporate power of the city.

We conclude that Act 63 of 1888 does not conflict with the Constitution of 1879, or Art. 353 of the said Constitution.

It is, therefore, ordered and adjudged and decreed that the judgment appealed from discharging the rule, be avoided and reversed, and that the rule be made absolute, and a peremptory mandamus issue as prayed for by relators.

---

## DISSENTING OPINION.

FENNER, J. The Governor and Attorney General of the State allege that the Mayor and Common Council of the City of New Orleans refuse to perform the duties imposed upon them by the terms of the Act 63 of 1888 " creating a Police Board," that the performance of those duties is essential to the execution of said law, and they pray for a mandamus compelling them to execute said law.

The respondents except to the proceeding on the grounds: first, that relators have no standing in court to prosecute the suit; second, that, if they have, their remedy is not by mandamus but by *quo war-*

*ranto.* As well said by the judge *a quo,* the law is one of public character, and the Constitution Art. 72, makes it the duty of the Governor to see that such laws are faithfully executed. This gives him the right to invoke .the judicial aid when proper and necessary for the performance of this duty.

Mandamus is expressly recognized by the Code of Practice as the proper remedy to compel "public officers to fulfil any of the duties attached to their office, or which may be legally required of them." Art. 832. There is no merit in these grounds of exception, and they were properly overruled. Respondents then deny the allegations of the petition and aver that the Act in question is unconstitutional.

This presents the serious issue in the case. The relators carry the burden of establishing that the duties of which they demand performance are imposed on the respondents by law and may be "legally required of them." If the Act of which enforcement is claimed is unconstitutional, it is not a law, and no duties can arise under it.

The Act, the enforcement of which is sought in this suit, is entitled " An Act creating a Police Board for the City of New Orleans, and defining its powers."

By its terms it declares that "the powers and duties connected with and incident to the police department and police discipline of the City of New Orleans and the parish of Orleans ( the city and parish being identical and co-extensive in territory) shall be vested in and exercised by a board consisting of six commissioners and of the Mayor of the city, and by such officers, patrolmen, etc., as may be appointed by said board."

This board is to be elected by the Common Council of New Orleans, "two for the term of four years, two for the term of eight years and two for the term of twelve years." Vacancies in the board arising in the board from death, resignation or removal from office are to be filled for the unexpired term by the Board. At the expiration of the respective terms the Council is to elect successors for the term of twelve years. The Mayor is made the presiding officer of the Board but has no vote except when there is a tie, in which case he has a casting vote.

The appointment of the whole police force is confided to the Board and they are to hold during good behavior and are removable only by the Board.

Although the Mayor is made the nominal commander-in-chief of the police force, no power whatever is conferred upon him to enforce obedience to his orders, all powers of discipline, punishment and removal being vested exclusively in the Board.

The members of the Board are removable by the Mayor for certain crimes, misdemeanors and specified acts of gross misconduct, on due proof before him, but the vacancy thus created is to be filled by the Board.

The powers vested in the police force are recited in the seventeenth section and are of the most exhaustive scope, viz :

" It is hereby made the duty of the police force at all time of day and night, and the members of such force are hereby thereunto empowered to especially preserve the public peace, to prevent crimes, detect and arrest offenders, suppress riots, mobs and insurrections, disperse unlawful or dangerous assemblages which obstruct the free passage of public streets, sidewalks, parks, squares and places; protect the rights of persons and property, guard the public health, preserve order at elections and all public meetings and assemblages, prevent and regulate the movement of teams and vehicles in streets, and remove all nuisances in public streets, parks and highways; arrest all street mendicants, beggars and vagrants; provide proper attendance at fires; advise and protect immigrants, strangers and travelers in public streets, at steamboat and ship landings, and at railroad stations; carefully observe and inspect all places of public amusement, all places of business having licenses to carry on any business; all houses of ill-fame or prostitution, and houses where common prostitutes reside or resort; all lottery offices authorized by law, policy or bucket shops; all gambling houses or houses where keno, lotto and other games are played; all cock-pits, rat-pits and public dance houses; and to repress and restrain all unlawful and disorderly conduct or practices therein; enforce and prevent the violations of all laws and ordinances in force in said city."

The financial estimate of the police expenses is to be made exclusively by the commissioners, and the Common Council is bound to accept such estimate and provide for it in its budget, at least to an extent not exceeding $150,000 *per annum*.

Such are the salient features of the Act.

The respondents resist the demand for its execution, on the ground that it violates Art. 253 of the Constitution, which provides :

" The citizens of the City of New Orleans, or any political corporation which may be created within its limits, shall have the right of appointing the several public officers, necessary for the administration of the police of said city, pursuant to the mode of election which shall be provided by the General Assembly."

This article, or its equivalent, has existed in all the Constitutions of this State with the exception of that of 1868. Its omission from the lat-

ter instrument was the ground upon which the Metropolitan Police Act was sustained. Diamond vs. Cain, 21 Ann. 319.

This Court has frequently had occasion to refer to this provision.

Thus in one case it said: " It is a remarkable fact that the people of Louisiana, in convention assembled, have twice considered the local government of this great metropolis as too important to be placed among those subordinate institutions, and have recognized the City of New Orleans, in its corporate capacity, as entitled to peculiar political powers and privileges. The right of the citizens of New Orleans to appoint the several public officers necessary for the administration of the police of said city, pursuant to the mode of election which shall be prescribed by the Legislature is secured and rendered permanent by the Constitution. Those political franchises stand upon the same ground as any other constitutional power, and the City of New Orleans and its officers are, for the purpose of police and good order and for the punishment of minor crimes and offenses, permanent functionaries of the Government. The counsel for the plaintiff derides the idea that the defendants are invested with sovereign powers. Names cannot alter things. Under our form of policy, no department of government exercises powers of sovereignty in its own right. The constitutional powers of the State are all trusts. The powers of the Legislature, of this Court, and of the City of New Orleans, differ in degree and object, but they all derive their binding force from the Supreme law of the State." Egerton vs. Muny, 1 Ann. 437; see also Bank vs. Nav'n Co., 3 Ann. 295; Stewart vs. City, 9 Ann. 460; Draining Co. case, 11 Ann. 371; Andrews vs. Saucier, 13 Ann. 301.

The case of State vs. New Orleans, 15 Ann. 354, was decided by a divided court and all the judges rendered separate opinions. The leading opinion by Mr. Justice Land formulated the following interpretation of the constitutional provision. " First, the word *police* used in said article of the Constitution signifies the laws and regulations enacted for the government of the City of New Orleans as a civil corporation; second, that those laws and regulations constituting the police of the city, form a distinct body or code of laws from those enacted for the internal regulation and government of the State of Louisiana; third, that the right of administration on the part of the city, through its officers, is expressly limited by the Constitution to the laws which constitute the police of the city or its municipal government." And he adds: " Then, the only remaining consideration is whether the Act of 1859, relative to elections in the City of New Orleans form a part of the police or government of the city as a civil corporation; or whether the Act per-

tains to and forms a part of the body of laws enacted for the internal regulation and government of the State."

This was the point on which the court divided, and the inference is irresistible, that had the court found that the Act pertained to the "police and government of the city as a civil corporation" it would have been unanimously held that it violated the Constitution.

The question on which that case hinged does not figure in the instant one at all. No one would be bold enough to deny that the commissioners composing the Board created by this Act, are "public officers," within the meaning of the constitutional provision, or that the powers and duties with which they are clothed are "necessary for the administration of the police of said city." Those powers not only pertain to, but actually absorb, the whole administration of the police powers which are included in the police department of the municipal government.

Being such officers, charged with such powers, the Constitution unequivocally confers upon "the citizens of the City of New Orleans," "the right of appointing" them, "pursuant to the mode of election which shall be provided by the General Assembly."

In the Charter of the city the Legislature had provided a form of government for the city, had designated therein the various officers who should be charged with the administration of its police, had fixed their term of office and had provided the mode of their election. "The citizens of the City of New Orleans" have appointed these officers by an election duly held, have confided to them these powers for the term limited in the law, and they have entered upon the discharge of their duties.

Now steps in the Legislature and strips these officers appointed by the citizens, of the powers conferred upon them, and requires them to elect a body of commissioners for terms of office much longer than their own, and to transfer to them the powers which were vested in them by the citizens for a strictly limited term.

How can such a proceeding be reconciled with the Constitution? In what sense can these commissioners be said to be appointed by the citizens of New Orleans? The citizens have certainly not directly appointed or elected them. They have not, expressly or by implication, authorized the Common Council, chosen by them, to appoint or elect such officers, because, at the time of the election, this statute had not been passed and no such officers existed, and because the powers of the Council itself were limited to four years.

If these commissioners should be chosen, it would be impossible to

say that they derived their authority, directly or indirectly, from the citizens of New Orleans, or from any expression of their will in any mode whatever.

Would any one contend that the Legislature could pass a law declaring that the Common Council, which has been elected by the citizens for the term of four years, should continue to hold the offices for twelve years? Could it possibly be claimed that, in such a case, after the expiration of the term for which they had been elected, those officers would hold, in any manner, by appointment of the citizens of New Orleans?

The irresistible negative which responds to the foregoing questions, utterly demolishes the proposition that such officers, elected for the term of four years, can, voluntarily or on compulsion, elect others and invest them with the essential powers of a municipal police and government for a term of twelve years.

Whatever latitude may be given to the authority secured to the General Assembly to provide the "mode of election," it cannot blot out the affirmative guaranty that "the citizens of New Orleans shall have the right of appointing" their officers *in* the *mode* so provided. It is self evident that the mode to be provided is the mode *pursuant* to which the citizens are to appoint their officers, and that, after the mode is provided, the citizens must be consulted and must have the opportunity of appointing in such mode.

The foregoing considerations are amply sufficient to defeat the mandamus herein, inasmuch as it is addressed exclusively to the present Mayor and Council of the city who were elected before the passage of this law, and on whom the citizens have not, either expressly or impliedly, conferred any authority to act for them in the appointment of these officers.

But if we take a larger view of the subject, are the constitution of this Board of Commissioners and the mode of their election consistent with the true meaning and intent of the Constitution?

I take it to be very clear that the Constitution intended to confer upon the citizens the substantial rights of self-government, to secure to them the privilege of appointing the officers charged with the administration of the police of the city; to hold such officers subordinate and responsible to the will of the people; and, to that end, to provide for recurring elections at which the people, if dissatisfied with their servants, may change them and confide these powers to different hands. It would hardly be claimed, that the Legislature could provide a "mode of election," under which the power of appointment by the citizens could be

exhausted by a single exercise thereof and the Council so elected should hold their offices permanently, and fill all vacancies which might occur in their body. Obviously such a mode, after the first election, would leave the city absolutely stripped of the right of appointing their officers guaranteed to them by the Constitution, not as a temporary, but as a permanent, right.

Now, under the constitution of this Board of Commissioners, the citizens of New Orleans are effectually deprived of the power of changing, at any time, the officers charged with the administration of the most important branch of municipal government. However unsatisfactory and insufficient the administration, however inconsistent with the public order and safety, the utmost power left in their hands or the hands of their elected representatives, would be, at intervals of four years, to change two out of six commissioners, still leaving the obnoxious majority in full control. If it be said that at the end of eight years they would enjoy the right of changing two more, thus making a majority, *non constat* that the two last elected might not, in that time, have become as obnoxious as the first, or that they might not have passed out by death, resignation or removal and their places have been filled by the Board itself with persons of like ilk. It thus readily appears how under the operation of this Act, the citizens may be indefinitely deprived of the power of controlling, in any manner, the administration of their police.

Moreover, if the Legislature may thus take away this important block of police powers from the elected representatives of the people and confide them in perpetuity to such a commission, why may it not proceed to deal similarly with all the other powers of municipal government and apportion them among several like commissions, so that the citizens and their elected representatives would be left stripped of all effective power and reduced to the position of mere figure-heads and purveyors to these independent and controlling bodies.

I cannot believe that such a condition would be consistent with the clear meaning and intent of the Constitution.

In a case before the Court of Appeals of New York, in which the Legislature sought, under certain colorable pretexts, to deprive the City of Troy of the control of its own police which was secured to it by the Constitution, that learned Court, after announcing its reluctance to adjudge an act of the Legislature to be unconstitutional, weightily said: " A written Constitution must be interpreted and effect given to it as the paramount law of the land, equally obligatory on the Legislature as upon other departments of government and upon individual citizens,

according to its spirit and the intent of its framers, as indicated by its terms. An act violating the true intent and meaning of the instrument, although not within the letter, is as much within the purview and effect of a prohibition, as if within its strict letter; and an act in evasion of the terms of the Constitution, as properly interpreted and understood, and frustrating its general and clearly expressed or necessarily implied purpose is as clearly void as if, in express terms, forbidden. A written Constitution would be of little avail as a practical and useful restraint upon the different departments of government, if a literal reading only was to be given to it, to the exclusion of all necessary implication, and the clear intent ignored, and acts palpably in evasion of its spirit should be sustained as not repugnant to it   *   * Usurpations of power, or the exercise of power in disregard of the express provision or plain intent of the instrument, as necessarily implied from all its terms, cannot be sustained under the pretense of a liberal interpretation, or in deference to the judgment of the Legislature or some supposed necessity, the result of a changed condition of affairs." People vs. Albertson, 55 N. Y. 55.

Fully adopting these views, I am bound to hold this Act is inconsistent with the clear intent and meaning of Art. 253 of the Constitution and, therefore, the demand for its enforcement should be denied.

Nothing in this opinion is designed to mitigate against the right of the Legislature to amend the charter of the city and to provide for the appointment by the Council of subordinate administrative officers who may be charged with certain functions during the tenure of the Council itself.

Nor is intended to pass upon the right of the Council, under proper authority, to make contracts or even to establish commissions for the execution of public works and improvements, necessarily requiring a longer period, and to confer authority upon such contractors or commissioners extending beyond its own term of office.

What is meant is simply that the essential powers of police and municipal government cannot be impounded in commissions such as the one provided in this law, not originally appointed by the citizens, or by representatatives of the citizens clothed with authority so to appoint them, having a perpetual organic existence, and placed beyond the reach and control of the people.

I, therefore, dissent.